**Reversed and Remanded and Majority Opinion filed December 29, 2020.**



In The

# 𝕱ourteenth 𝕮ourt of 𝕬ppeals

## NO. 14-18-01108-CV

### AQUATIC CARE PROGRAMS, INC., Appellant

### V.

### KATHLEEN DENISE COOPER, Appellee

**On Appeal from the 133rd District Court
Harris County, Texas
Trial Court Cause No. 2018-20681**

## M A J O R I T Y   O P I N I O N[1]

Appellant/defendant Aquatic Care Programs, Inc. asserts that the trial court abused its discretion in overruling objections to appellee/plaintiff Kathleen Denise Cooper's expert reports and in denying Aquatic Care's motions to dismiss based on alleged violations of the Texas Medical Liability Act's[2] expert-report

---

[1] Justice Bourliot concurs without opinion.

[2] "Chapter 74" and "Texas Medical Liability Act" refer to sections 74.001 through 74.507 of the Texas Civil Practice and Remedies Code.

requirements.  We reverse and remand to the trial court for rendition of a judgment of dismissal.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Cooper sought treatment for pain and numbness in her legs. Her doctor prescribed a course of aquatic therapy and referred her to Aquatic Care. In early 2016, Cooper began a regular program of pool exercise in Aquatic Care's facility.

Cooper alleges that in late May 2016, she contracted a waterborne bacterial infection after exercising in Aquatic Care's pool.   According to Cooper's doctor, cultures confirmed that her infection was pseudomonas—a bacteria known to be found in health care settings, and "in the environment, specifically in water." The bacteria is resistant to antibiotics.  Doctors admitted Cooper to the hospital, where she stayed for two weeks. Upon her discharge, doctors prescribed medications for treatment at home.  Because of a worsening medical condition, in mid-October 2016, Cooper returned to the hospital for further care.  A week later she received a discharge and transfer to another hospital that could better accommodate her special needs. Cooper received treatment from Dr. Jason R. Bailey, who performed a lolipoma excision of her left lower extremity abscess.  Cooper then moved to another hospital to continue management of an infection of the left lower-extremity wound and cellulitis of bilateral lower extremities.

### Cooper's Pleaded Allegations

Cooper filed this lawsuit against Aquatic Care asserting various negligence theories and alleging that Aquatic Care (1) negligently permitted a dangerous condition to exist in its pool that caused her to get a water-borne bacterial pseudomonas infection; (2) negligently failed to warn her of the dangerous condition before she entered the pool to exercise; (2) failed to inspect by testing the

2

pool water to determine its bacteria level; (3) failed to correct the pool water's dangerous bacterial level by adding additional chemicals to kill the bacteria in the pool water; (4) failed to warn invitees, including Cooper, that a dangerous bacterial condition existed before they entered the pool water; (5) failed to test Cooper to see whether she had contacted any virulent bacteria in Aquatic Care's facility; and (6) engaged in a dangerous activity by promoting the growth of allegedly flesh-eating bacteria in the pool as opposed to stopping the growth of the organism.

*Cooper's Expert Reports and Aquatic Care's Objections*

Cooper served Aquatic Care with (1) a report from her internist, Danny D. Cheng, M.D., with a printout from Cheng's professional website containing his biographical information, and (2) a report from Laraine Enderle, P.T., a California-board certified physical therapist, with Enderle's curriculum vitae. Aquatic Care filed objections to the expert reports and a motion to dismiss Cooper's lawsuit.

Aquatic Care complained that both of Cooper's expert reports failed to meet the requirements of Chapter 74 of the Texas Medical Liability Act. As to Cheng's report, Aquatic Care asserted (1) Cheng's curriculum vitae was insufficient, (2) Cheng failed to address any of the required elements under Chapter 74, and (3) the opinions expressed in Cheng's report were conclusory. As to Enderle's report, Aquatic Care complained that (1) Enderle lacked the qualifications to render opinions on the standard of care, (2) Enderle did not address required elements under Chapter 74 as to how Aquatic Care allegedly breached the standard of care, and (3) Enderle made conclusory statements in saying that it would be "unlikely" for someone to contract "flesh-eating bacteria" if various safeguards were followed.

Despite Cooper's serving of expert reports on Aquatic Care, Cooper viewed her claims as not being health care liability claims, and she moved for summary

judgment to bar application of Chapter 74 to her claims. Aquatic Care filed supplemental objections to Cooper's Chapter 74 expert reports and addressed in more detail whether Cooper's claims fell within the scope of the statute.

At a hearing on September 10, 2018, the trial court ruled that Cooper's claims fell under the Texas Medical Liability Act and granted Cooper's oral request for a thirty-day extension to satisfy the expert-report requirements. The trial court reduced its ruling to a written order signed on October 8, 2018, reciting an effective date of September 10, 2018, the date of the hearing. A few months later, on December 4, 2018, Cooper filed and served documents purporting to be Jason R. Bailey, M.D.'s expert report. Cooper did not file or serve a curriculum vitae for Dr. Bailey. Days later Aquatic Care objected that Cooper had not filed Bailey's report on time or included the requisite curriculum vitae. The next week the trial court signed an order, dated December 10, 2018, overruling Aquatic Care's objections and denying its motion to dismiss. From that order, Aquatic Care timely filed this interlocutory appeal.

## II. ISSUES AND ANALYSIS

Aquatic Care presents a single issue: Did the trial court err in denying the motion to dismiss based on Cooper's failure to satisfy Chapter 74's expert-report requirements? Cooper urges on appeal, as she did in the trial court, that her claims do not fall within the scope of the Texas Medical Liability Act. Specifically, she asserts that Aquatic Care is not a "health care institution" under the statute. In its reply brief, Aquatic Care argues that Cooper's scope argument is not properly before this court because Cooper failed to raise it in the trial court, and alternatively, that Cooper's claims do fall within the scope of the statute because apart from whether Aquatic Care falls within the statutory definition of a "health care institution," Aquatic Care is a "health care provider" under the statute. *See*

4

*Rehab. Care Sys. of Am. v. Davis*, 73 S.W.3d 233, 234 (Tex. 2002); *Skloss v. Perez*, 01-08-00484-CV, 2009 WL 40438, at \*6 (Tex. App.—Houston [1st Dist.] Jan. 8, 2009, no pet.) (mem. op.). The applicability of the Texas Medical Liability Act to Cooper's claims is a threshold issue this court must address in disposing of this interlocutory appeal.

### Applicability of the Texas Medical Liability Act

Whether Cooper's claim amounts to a health care liability claim is a question of law we review de novo. *Bioderm Skin Care, LLC v. Sok*, 426 S.W.3d 753, 757 (Tex. 2014); *see Johnson v. City of Fort Worth*, 774 S.W.2d 653, 655–56 (Tex. 1989). In construing a statute, our objective is to determine and give effect to the Legislature's intent. *See Nat'l Liab. & Fire Ins. Co. v. Allen*, 15 S.W.3d 525, 527 (Tex. 2000). If possible, we must ascertain that intent from the Legislature's words in the statute and not look to extraneous matters for an intent the statute does not state. *Id*. Where the statutory language is unambiguous, we give the statute the interpretation supported by the plain meaning of the provision's words. *St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 505 (Tex. 1997). We must not engage in forced or strained construction; instead, we must yield to the plain sense of the words the Legislature chose. *See id*.

Chapter 74 defines a "health care liability claim" as

> a cause of action *against a health care provider or physician* for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract. The term does not include a cause of action described by Section 406.033(a) or 408.001(b), Labor Code, against an employer by an employee or the employee's surviving spouse or heir.

5

Tex. Civ. Prac. & Rem. Code Ann. 74.001(a)(13)(emphasis added).

Under the statute's plain meaning, to be protected by Chapter 74's procedures a defendant must be a health care provider or a physician, both of which are defined terms. The statute defines a health care provider as follows:

(A) "Health care provider" means *any* person, partnership, professional association, corporation, facility, or institution duly licensed, certified, registered, or chartered by the State of Texas to provide health care, including:

(i) a registered nurse;

(ii) a dentist;

(iii) a podiatrist;

(iv) a pharmacist;

(v) a chiropractor;

(vi) an optometrist;

(vii) a health care institution; or

(viii) a health care collaborative certified under Chapter 848, Insurance Code.

(B) The term includes:

(i) an officer, director, shareholder, member, partner, manager, owner, or affiliate of a health care provider or physician; and

(ii) an employee, independent contractor, or agent of a health care provider or physician acting in the course and scope of the employment or contractual relationship.

Tex. Civ. Prac. & Rem. Code Ann. 74.001(a)(12)(emphasis added).

The term "health care institution," incorporated within the definition of "health care provider," expressly includes the following:

(A) an ambulatory surgical center;

(B) an assisted living facility licensed under Chapter 247, Health and Safety Code;

(C) an emergency medical services provider;

6

(D) a health services district created under Chapter 287, Health and Safety Code;

(E) a home and community support services agency;

(F) a hospice;

(G) a hospital;

(H) a hospital system;

(I) an intermediate care facility for the mentally retarded or a home and community-based services waiver program for persons with mental retardation adopted in accordance with Section 1915(c) of the federal Social Security Act (42 U.S.C. Section 1396n), as amended;

(J) a nursing home; or

(K) an end stage renal disease facility licensed under Section 251.011, Health and Safety Code.

Tex. Civ. Prac. & Rem. Code Ann. 74.001(a)(11).

As Cooper points out, "aquatic therapy center" is not specifically listed in the definition of "health care provider" or "health care institution." Nor are the terms "aquatic therapist", "physical-therapy center," or "physical therapist" listed in Chapter 74.

Several other courts of appeals have concluded that the terms listed in sections 74.001(a)(11) and (12) are not exclusive. *See Skloss v. Perez*, 01-08-00484-CV, 2009 WL 40438, at *3 (Tex. App.—Houston [1st Dist.] Jan. 8, 2009, no pet.); *Fudge v. Wall*, 308 S.W.3d 458, 461 (Tex. App.—Dallas 2010, no pet.); *Mike Norgaard, LPC v. Pingel*, 296 S.W.3d 284, 288 (Tex. App.—Fort Worth 2009, no pet.). Though some of our cases contain passing references to the exclusivity question, we have yet to address the issue directly. *See Tex. Cypress Creek Hosp., L.P. v. Hickman*, 329 S.W.3d 209, 214 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (noting in an obiter dictum that other courts have recognized that Chapter 74's list of healthcare providers is not exclusive). So, today we consider as a matter of first impression in this court whether a particular

entity that otherwise satisfies the statutory definition of "health care provider" but is not listed in either subsection (11) or (12) of section 74.001(a) falls within Chapter 74's definition of "health care provider."

When given its ordinary meaning, the word "including" followed by a list of common types of health care providers cannot fairly be read as "just including" or "including only." A party who satisfies the criteria of being a "person, partnership, professional association, corporation, facility, or institution duly licensed, certified, registered, or chartered by the State of Texas to provide health care" need not be anything else to be a "health care provider." *See* Tex. Gov't Code Ann. § 311.005(13) (stating that "includes" and "including" are terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded); *Vision 20/20, Ltd. v. Cameron Builders, Inc.,* 525 S.W.3d 854, 857 (Tex. App.—Houston [14th Dist.] 2017, no pet.). This statutory construction aligns with that of our Houston sister court, and so provides a greater measure of certainty and predictability on this point in cases within our shared jurisdiction. *See City of Houston v. Houston*, 608 S.W.3d 519, 525 (Tex. App.—Houston [1st Dist.] Aug. 25, 2020, no pet. h.) (collecting cases).

At least one Texas court of appeals has found that physical therapists and the facilities specializing in physical therapy satisfy the definition of health care provider. *Trevino v. MC45 Holdings, L.L.C.*, No. 04-11-00839-CV, 2012 WL 4577484, at *3 (Tex. App.—San Antonio Oct. 3, 2012, no pet.) (holding that a physical therapy facility is a health care provider under Chapter 74) (mem. op). In support of its contention that Aquatic Care satisfies the Chapter 74 definition of "health care provider," Aquatic Care provided an affidavit of its Chief Operating Officer, R. Brian Haden, in which he states:

Aquatic Care Programs, Inc. provides comprehensive physical therapy and rehabilitation services to patients. Aquatic Care Programs, Inc. is a physical therapy facility registered with and licensed by the Texas Board of Physical Therapy Examiners. Aquatic Care Programs, Inc. employs and is directed by licensed physical therapists that provide therapy services to patients.

Patients at Aquatic Care Programs, Inc. are evaluated by licensed physical therapists.

All patients at Aquatic Care Programs, Inc, received treatment pursuant to a physician order. Patients received therapy services directed by a licensed physical therapist or physical therapy assist [sic] (PTA). Records of the therapy services, including progress notes, medical history summaries, S.O.A.P. notes, are generated by the caregivers.

Against this record, we consider whether Aquatic Care falls within Chapter 74's definition of "health care provider." Under the Occupation Code, "[p]hysical therapist" is defined as "a person who is licensed by the board as a physical therapist and practices physical therapy," and the definition specifically includes "a hydrotherapist" among a list of statutorily recognized types of physical therapists. Tex. Occ. Code Ann. § 453.001(4). Moreover, the Occupation Code defines "[p]hysical therapy" as "a form of health care that prevents, identifies, corrects, or alleviates acute or prolonged movement dysfunction or pain of anatomic or physiologic origin." Tex. Occ. Code Ann. § 453.001(6). As someone licensed by the State to provide "a form of health care," a licensed physical therapist (including a hydrotherapist) falls within Chapter 74's definition of a health care provider. Tex. Civ. Prac. & Rem. Code Ann. 74.001(a)(12); *see Trevino*, 2012 WL 4577484, at *3.

In his affidavit Haden sets out that (1) Aquatic Care is a physical-therapy facility registered with and licensed by the Texas Board of Physical Therapy Examiners, a state agency; and (2) Aquatic Care provides "comprehensive physical

therapy [health care] and rehabilitation services to patients," as directed by licensed physical therapists (health care providers) that provide therapy services to patients. We conclude that Aquatic Care meets the definition of a health care provider. *See* Tex. Civ. Prac. & Rem. Code Ann. 74.001(a)(12); *see Trevino,* 2012 WL 4577484, at *3.

We next consider whether Cooper's claims against Aquatic Care meet the remainder of the definition of "health care liability claim". Cooper originally alleged that her doctor referred her to Aquatic Care "for comprehensive physical therapy." Consistent with her original allegations, Haden's affidavit states that all of Aquatic Care's patients (which include Cooper) received "treatment pursuant to a physician order." Cooper alleges that her infections were based on exposure to the allegedly harmful conditions at Aquatic Care, a physical therapist-directed facility, where she alleges the therapy occurred.

We conclude that Cooper's claims are health care liability claims because she has asserted a claim against Aquatic Care, a health care provider, based on allegations that Aquatic Care departed from accepted standards of health care. *See Rehabilitative Care Sys. of Am. v. Davis,* 73 S.W.3d 233, 234 (Tex. 2002) (stating a suit against physical therapist is "no different from any other medical-malpractice suit in that the applicable standard of care must generally be established by expert testimony."); *Ponce v. El Paso Healthcare Sys., Ltd.*, 55 S.W.3d 34, 36–38 (Tex. App.—El Paso 2001, pet. denied) (finding a health care liability claim arose from physical therapist's conduct where physical therapist acted as an agent to another health care provider); *Trevino*, 2012 WL 4577484, at *3. That the environment Cooper alleges to be harmful, pool water, also is found outside the health care setting does not, as Cooper contends, place it outside the scope of Chapter 74. *See Clark v. TIRR Rehab. Ctr.*, 227 S.W.3d 256, 260–62 (Tex. App.—Houston [1st

Dist.] 2007, no pet.) (determining that health care liability claim arose from general conditioning and strength training when performed at a rehabilitation facility, assisted by a physical therapist, and pursuant to a prescription or based on the need for health care supervision even if those same activities could have been performed at "a local gym"). Having concluded that Cooper's claim against Aquatic Care is a health care liability claim, we next consider whether Cooper has satisfied the procedural requirements under Chapter 74.

## Applicable Legal Standards

We review a trial court's ruling on the adequacy of an expert report under the Medical Liability Act for an abuse of discretion. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015) (per curiam); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877 (Tex. 2001). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to guiding rules or principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam); *Lucas v. Clearlake Senior Living Ltd. P'ship*, 349 S.W.3d 657, 660 (Tex. App.—Houston [14th Dist.] 2011, no pet.). When reviewing matters committed to the trial court's discretion, a court of appeals may not substitute its own judgment for the trial court's judgment. *See Wright*, 79 S.W.3d at 52; *Lucas*, 349 S.W.3d at 660.

Under section 74.351, a claimant, not later than the 120th day after the date a health-care liability claim is filed, must serve on each party one or more expert witness reports addressing liability and causation. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a), (j) (West, Westlaw through 2017 R.S.); *Lewis v. Funderburk*, 253 S.W.3d 204, 205 (Tex. 2008). The statute defines an "expert report" as

> [A] written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable

11

standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6) (West, Westlaw through 2017 R.S.). A trial court shall grant a motion challenging the adequacy of the expert report if the report is not an objective good-faith effort to comply with the definition of an expert report provided in section 74.351(r)(6). *Id.* §§ 74.351(*l*), (r)(6). The law limits the trial court's inquiry to the four corners of the report. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010).

The report must contain sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the plaintiff's claims have merit. *See id.* at 539. Omission of any of the statutory elements prevents the report from being a good-faith effort. *See id.* A report that merely states the expert's conclusions about the standard of care, breach, and causation does not meet the statutory requirements. *See id.* In providing the expert's opinions on these elements, the claimant need not marshal evidence as if actually litigating the merits at trial or present sufficient evidence to avoid summary judgment. *See id.*

If a report is served, then each health care provider whose conduct is implicated must file and serve any objection to the sufficiency of the report not later than the later of the 21st day after the date the report is served or the 21st day after the date the defendant's answer is filed, "failing which all objections are waived." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). If an expert report has not been properly served "because elements of the report are found deficient," then the trial court may grant a single thirty-day extension to the claimant to cure the deficiency. *Id.* § 74.351(c).

A trial court must grant a motion to dismiss a plaintiff's suit if it appears to the court that the expert report does not represent an objective good-faith effort to comply with the definition of an expert report. *Id.* § 74.351(l), (r)(6). If the plaintiff fails to serve a timely and compliant expert report, then the trial court shall dismiss the claim with prejudice and shall award reasonable attorney's fees and costs to the defendant. *Id.* § 74.351(b).

A compliant report must include an explanation of the basis for the expert's statements and link the expert's conclusions to the facts. *Wright*, 79 S.W.3d at 52; *Gannon*, 321 S.W.3d at 897. A report that merely states the expert's conclusions about the standard of care, breach, and causation does not meet the statutory requirements. *Palacios*, 46 S.W.3d at 879; *see Wright*, 79 S.W.3d at 53.

To comply with these requirements, and constitute a "good-faith effort," a report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Palacios*, 46 S.W.3d at 879; *Gannon v. Wyche*, 321 S.W.3d 881, 889 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). The report need not marshal all of the plaintiff's proof, but the report must include the expert's opinion on each of the elements identified in the statute: standard of care, breach, and causation. *Palacios*, 46 S.W.3d at 878–79. Finally, we note "multiple expert reports may be read together" to determine whether the statutory requirements have been met. *Abshire*, 563 S.W.3d at 223. Tex. Civ. Prac. & Rem. Code. § 74.351.

Aquatic Care cites the following grounds for striking Cooper's three expert reports and dismissing her lawsuit:

| Danny D. Cheng, M.D. | • Lack of a sufficient curriculum vitae |

13

| | |
|---|---|
| | - Inadequate proof of Cheng's qualifications to render opinions on aquatic therapeutic services
- Failure to address any element (standard of care, breach, causation) of Cooper's claims |
| Laraine Enderle, P.T. | - Inadequate proof of Enderle's qualifications to render opinions on aquatic therapeutic services
- Failure to provide report in good faith that addresses the conduct in question, and causal connection |
| Jason R. Bailey, M.D. | - Failure to provide any curriculum vitae
- Failure to provide a timely report
- Failure to provide report in good faith that addresses the conduct in question, and causal connection |

**Timeliness of Bailey's Report**

Aquatic Care asserts that Cooper failed to serve Bailey's report timely. Cooper provided Bailey's report on December 3, 2018, well beyond the trial court's thirty-day extended deadline. Even assuming for argument's sake that the extension ran from the trial court's written October 10, 2018 order (as opposed to the date of the oral hearing in September 2018), the Bailey report still would be late. Cooper seems to concede the untimeliness of the report, though she does not formally do so. According to Cooper, she did not offer the report to satisfy any required statutory component but to provide details about her treatment. The trial court indicated that it would not consider Bailey's report in ruling on the objections and motion to dismiss, but issued no written order to this effect. The trial court's order denying Aquatic Care's motion to dismiss does not state the basis for

14

denying the motion; the trial court did not indicate which experts were qualified or as to which element they were qualified, or which expert satisfied the good-faith requirement as to as to any particular element. The trial court should have sustained Aquatic Care's untimeliness objection to Bailey's report. And, because Bailey's report was not timely, to the extent Cooper offered it to satisfy Chapter 74's expert-report requirement on any element, Bailey's report could provide no basis to support the trial court's order denying Aquatic Care's motion to dismiss. *See Nexion Health at Beechnut, Inc. v. Paul*, 335 S.W.3d 716, 718 (Tex. App.— Houston [14th Dist.] 2011, no pet.) (concluding the trial court had no discretion to take any action other than dismissing the claim where plaintiff filed report one day after the expiration of the thirty-day extension).

## Adequacy of Cheng's Curriculum-Vitae

Aquatic Care raises a relatively novel issue of curriculum-vitae adequacy, arguing that the printout from Cheng's website containing biographical information is inadequate to serve the purposes of the curriculum-vitae requirement and thus renders Cheng's report insufficient under the statute. Specifically, Aquatic Care claims that Cheng's webpage printout containing biographical information is "not actually a CV" and that it fails to contain "all of the information that would normally be included in a CV."

Section 74.351(a) requires that along with the expert report, the party files the expert's curriculum vitae. Tex. Civ. Prac. & Rem. Code Ann. 74.351(a). This court has not viewed the curriculum-vitae requirement as imposing rigid requirements on the form or contents of the curriculum vitae. *See Univ. of Tex. Med. Branch at Galveston v. Simmons,* No. 14–09–00246–CV, 2009 WL 4810296, at *3 (Tex. App.— Houston [14th Dist.] Dec. 15, 2009, no pet.) (concluding there is no requirement in the statute that the report and the curriculum vitae be separate

15

documents); *see also Ibrahim v. Gilbride*, 14-09-00938-CV, 2010 WL 5064430, at *2–3 (Tex. App.—Houston [14th Dist.] Dec. 9, 2010, no pet.) (describing paragraph summarizing expert's education and background as "fairly scant" but finding it sufficient to qualify as a curriculum vitae) (mem. op.).

The legible portions of the printout from Cheng's webpage indicate he is board certified in internal medicine, that he taught and trained students in that subject area, and that he specializes in hypertension, diabetes mellitus, and heart disease, and that he holds advanced positions at University General Hospital. The printout also provides a summary of his professional experience and credentials. A curriculum vitae does not fail merely because it takes the form of a printout from a webpage. *See Ibrahim*, 2010 WL 5064430, at *2–3. The content of the printout from Cheng's webpage suffices to satisfy Chapter 74's curriculum-vitae requirement. *See id.* Therefore, we cannot conclude that the failure to provide more information about Cheng's professional background in a separate curriculum vitae, contained within his expert report, renders the information Cheng provided so insubstantial as to amount to providing no curriculum vitae at all.

The trial court did not abuse its discretion in not sustaining Aquatic Care's objection to Cheng's report on the basis that the printout from Cheng's webpage is insufficient to meet the requirements under Chapter 74.

### Experts' Qualifications

Aquatic Care argues that Enderle's and Cheng's reports and curricula vitae fail to set forth their respective qualifications to render opinions on the designated subjects. The only opinion Cheng provided is that Cooper's water-borne bacterial infection may have been contracted during aquatic therapy. Enderle was designated to opine as to (1) the standard of care pertinent to providing aquatic therapy and (2) breach of that standard.

16

In assessing the qualifications of an expert in a suit against a health care provider we look to section 74.402 of the Texas Civil Practice and Remedies Code, which provides:

> (b) In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:
>
> (1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;
>
> (2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and
>
> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.
>
> (c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:
>
> (1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and
>
> (2) is actively practicing health care in rendering health care services relevant to the claim.

Tex. Civ. Prac. & Rem. Code Ann. § 74.402; *San Jacinto Methodist Hosp. v. Bennett*, 256 S.W.3d 806, 812–13 (Tex. App.—Houston [14th Dist.] 2008, no pet.). The law limits our analysis of an expert's qualifications to the four corners of the expert's report and curriculum vitae. *See Burrell,* 230 S.W.3d at 758 (describing analysis of qualifications under section 74.351, which, in turn, contains a reference to section 74.402).

Aquatic Care contends that Cheng's credentials, as provided on the webpage printout and in Cheng's two-paragraph report, do not reflect that Cheng has any relevant expertise in aquatic therapy. To be qualified to opine that an institutional health-care provider breached the applicable standard of care, one must have "knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim" and be "qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care." Tex. Civ. Prac. & Rem. Code Ann. § 74.402(b)(2), (b)(3). Qualifications must appear in the expert report and cannot be inferred. *Baylor Coll. of Med. v. Pokluda*, 283 S.W.3d 110, 117 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Cheng's only opinion is that Cooper's water-borne bacterial infection may have been contracted during aquatic therapy. Cheng did not offer an opinion as to whether any alleged breach of the standard of care caused Cooper's injuries. The relevant standards of care applicable to the case pertain to Aquatic Care's *care* — pool-based physical therapy used to treat a back injury. The report and printout offered in support of Cheng's qualifications do not show that Cheng has any relevant training or experience to render an opinion on the appropriate standard of care for the aquatic therapy, pool chemistry, or other related practices in pool sanitation. *See Ibrahim*, 2010 WL 5064430, at *6–8 (concluding that expert was not qualified to render expert opinion when his report and curriculum vitae failed to describe *how* he acquired sufficient knowledge, skill, experience, training or education to opine on the accepted standard of care). In the absence of evidence in the record to support the trial court's implicit approval of Cheng's qualifications, we hold that the trial court abused its discretion by ruling Cheng qualified to opine on Cooper's claims against Aquatic Care. *See id.*

In her report, Enderle focuses exclusively on the health and safety standards applicable to aquatic therapy and pool sanitations. Relying on published water safety guidelines set out by an array of different agencies, Enderle states in her report that "physical therapy aquatic programs should strictly adhere to mandated guidelines to provide a safe environment for their patients." The report details how such programs are expected to ensure safety in three regulated areas: (1) safe water, (2) safe pool environment, and (3) proper supervision.

Enderle's curriculum vitae indicates that at the beginning of her career as a physical therapist, while at the Northridge Hospital Medical Center from 1989 to 1992, she provided "aquatic therapy" to patients in addition to an assortment of other physical-therapy modalities. The document contains no details as to the extent of her participation in aquatic care relative to the other physical therapy services she provided at the time. And, unlike the other areas of her practice listed in her curriculum vitae, it does not appear that she ever had experience as an instructor, trainer, or administrator with respect to aquatic therapy. This remote-in-time reference is the only indication of any connection Enderle has with aquatic therapy. Enderle offered no detail about how she became familiar with the standards of care applicable to water safety at a facility like Aquatic Care.

Enderle's curriculum vitae shows she has been certified as a physical therapist in California by the state's physical therapy board for thirty years, that she is a certified clinical instructor, a member of the American National Physical Therapy Association, and since 1987 has worked in physical therapy in an array of settings (hospital, clinical, and outpatient). Yet, neither her curriculum vitae nor her report contains any indication that she has experience in the past twenty-five years providing, teaching, or administering aquatic therapy. That Enderle holds expertise as a physical therapist does not, without more, establish that she

possesses the training or experience to offer an expert opinion about the accepted standards of health care involved in aquatic therapy. *See In re Windisch,* 138 S.W.3d 507, 514 (Tex. App.—Amarillo 2004, no pet.) (per curiam) (finding expert report inadequate for statutory purposes because report failed to indicate experience which could "reasonably be said to demonstrate that [expert] has knowledge of the accepted standard of care for the procedure" at issue); *Marente v. Asah*, 486 S.W.3d 680, 691–92 (Tex. App.—Texarkana 2016, no pet.); *Methodist Hosp. Levelland v. Kimbrell*, 07-09-0104-CV, 2009 WL 3101315, at *1–2 (Tex. App.—Amarillo Sept. 29, 2009, no pet.); *Christus Health Se. Tex. v. Broussard*, 267 S.W.3d 531, 536 (Tex. App.—Beaumont 2008, no pet.). Aquatic therapy may fall under the umbrella of physical therapy, but as the facts of this case reveal, the pool environment in which aquatic therapy takes place, presents unique safety concerns not clearly associated with other forms of physical therapy.

Nothing in Enderle's report or curriculum vitae reveals how the roles she has had in physical therapy over the past twenty-five years convert to training, experience, or know-how for the safety concerns in the pool environment. In *Savaseniorcare Admin. Services, L.L.C. v. Cantu*, the court of appeals reversed the trial court's order overruling objections to the qualifications of a physician board certified in internal medicine, pulmonary medicine, critical care medicine, and sleep medicine and who practiced in those fields of medicine at a clinic, who offered opinions that focused on the care and treatment the plaintiff received or should have received from a nursing and physical therapy staff. 04-14-00329-CV, 2014 WL 5352093, at *3 (Tex. App.—San Antonio Oct. 22, 2014, no pet.) (mem. op.). Despite the expert's assertion that he was familiar with the usual standard of care for a facility based on his professional activities and experiences, the crux of the court's holding was that it found nothing in the expert's report or in his

curriculum vitae that revealed how the expert became familiar with this standard of care. *Id.; see also Renaissance Surgical Centers-S. Tex., L.L.P. v. Jimenez*, 13-07-121-CV, 2008 WL 3971096, at *7–8 (Tex. App.—Corpus Christi Aug. 28, 2008, no pet.) (finding that despite his history of employment in various administrative capacities at hospitals, expert was not qualified to render opinions about standards for discharging a patient or how to properly monitor a patient, or the standards applicable to a nurse or other employee who has discharged a patient that received an anesthetic when his resume provided no indication that he had experience developing or implementing such standards) (mem. op.). In the absence of any explanation of *how* the bare notation of "aquatic therapy" mentioned in conjunction with an assortment of other physical-therapy modalities (or anything else in the report) establishes that Enderle has the relevant training and experience to provide opinions about the standard of care or breach in this case, Cooper fails to demonstrate Enderle's qualifications to provide standard-of- care and breach-of-standard opinions. *See id.*

Even if Enderle holds such knowledge, her report and curriculum vitae failed to show it to the trial court at any point in the proceedings below. The trial court noted on the record that the "physical therapist doesn't seem to have any expertise in aquatic therapy." Though the trial court seemed to acknowledge that Enderle's opinions were not consistent with the statutory requirements, the trial court nonetheless admitted the report, without noting a "good reason" for doing so. *See* Tex. Civ. Prac. & Rem. 74.402(d) (stating that "[t]he court shall apply the criteria specified in Subsections (a), (b), and (c) in determining whether an expert is qualified to offer expert testimony on the issue of whether the defendant health care provider departed from accepted standards of health care but may depart from those criteria if, under the circumstances, the court determines that there is good

21

reason to admit the expert's testimony. The court shall state on the record the reason for admitting the testimony if the court departs from the criteria").

In the absence of a qualified expert with a report addressing the essential liability components of Cooper's health care liability claims, the trial court abused its discretion in failing to sustain Aquatic Care's objections. Because the trial court already had granted Cooper one thirty-day extension to supplement her expert reports, the trial court had no discretion to overrule the objections; instead, the law required the trial court to grant Aquatic Care's motion to dismiss. We therefore sustain Aquatic Care's sole issue on appeal.

### III. CONCLUSION

Having found that Cooper's claims fall within the scope of the Texas Medical Liability Act and having found merit in Aquatic Care's appellate challenge, we reverse the trial court's order denying Aquatic Care's motion to dismiss and remand this case to the trial court for rendition of judgment dismissing Cooper's claims against Aquatic Care.


/s/     Kem Thompson Frost
        Chief Justice


Panel consists of Chief Justice Frost and Justices Christopher and Bourliot (Bourliot, J. concurring without opinion).

22